2000 SD 41

**Beverly E. ENGLEHART, Plaintiff and Appellee,**

v.

**Gary LARSON, Defendant and Appellant,**

**and**

**Clark Starr; Ruby Starr; Perkins County, a subdivision of the State of South Dakota; and the Internal Revenue Service, an agency of the United States of America, Defendants.**

**No. 20784.**

Supreme Court of South Dakota.

Argued Feb. 15, 2000.

Decided March 29, 2000.

Max Main and Dwight A. Gubbrud of Bennett, Main & Bailey, Belle Fourche, for plaintiff and appellee.

James P. Hurley of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, for defendant and appellant.

SABERS, Justice.

[¶ 1.] Beverly Englehart sued her brother, Gary Larson, alleging that Gary's oral lease of trust property terminated on May 31, 1993, the date of the life tenant's death. The trial court granted summary judgment to Beverly. Gary appeals. We affirm.

## FACTS

[¶ 2.] Rudolph and Hannah Larson were the parents of Beverly and Gary. The Rudolph Larson Trust was established upon Rudolph's death in 1974. Pursuant to the terms, Rudolph's agricultural land and other assets were held in trust for the benefit of Hannah during her life.[1] Hannah and Beverly were designated as co-trustees. At Hannah's death, the trust terminated and the land was to be equally divided between Beverly and Gary:

> THIRD: Upon the death of Hannah Larson, the Trust shall terminate and all of the assets, real and/or personal there-

---

1. The parties and the trial court continually referred to Hannah as the "life tenant" when in fact, she was the sole "income beneficia- ry." In view of these references (and facts) and the language of the Trust, we also refer to her as the "life tenant" in this opinion.

of, shall be paid over and distributed as follows:

½ to Gary Larson and ½ to Beverly Englehart.

It is further ordered, adjudged and decreed that in regard to the Trust the Trustees shall hold and manage the property comprising said Trust with Power to sell, exchange, mortgage or otherwise dispose of any of the property as they may deem proper.... No beneficiary other than Hannah Larson shall have any transferable interest in the Trust Estate ... and no beneficiary other than Hannah Larson shall have any power to sell, assign transfer, encumber or in any other manner to anticipate or dispose of his or her interest in the Trust....

[¶ 3.] After Rudolph's death, Hannah continued to live on the family farm with Gary. Hannah leased the trust property to Gary so he could continue the farming and ranching business. The leases were oral and renewed every year from 1974 to 1991.[2] In consideration of the lease, Gary agreed to pay the real estate taxes and any expenses incurred by Hannah.

[¶ 4.] Under the terms of the lease, Gary was allowed to apply for federal benefits through a United States Department of Agriculture program entitled Agricultural Stabilization Conservation Service (ASCS). In 1991, ASCS required Gary to provide a written lease for farm # 1198.[3] The lease, drafted by Beverly, named the lessor as the Trust and the lessee as Gary. The complete lease provides:

> This agreement made the 26[th] day of April, 1991 by Rudolph Larson Trust Estate, Hannah Larson Trustee, and Beverly Englehart Trustee, Lessor and Gary Larson, Lessee.

The Lessee agrees to pay all taxes and expenses incurred by Hannah Larson for lease of the Rudolph Larson Trust Estate in Perkins County.

Gary signed the lease as lessee and Beverly and Hannah signed the lease as trustees on behalf of the Trust.

[¶ 5.] No written leases were made thereafter, but Gary continued to orally lease the property from Hannah in 1992 and 1993.

[¶ 6.] On May 31, 1993, Hannah died. Her life interest in the property was formally terminated by Judgment and Order dated February 21, 1994. After a dispute, Beverly and Gary partitioned the land.[4] A partition judgment was issued April 2, 1996 and affirmed on appeal. *See Englehart v. Larson*, 1997 SD 84, 566 N.W.2d 152.

[¶ 7.] Gary prepared to farm and ranch all of the trust land in 1994. In anticipation, he applied for 1994 ASCS benefits. Beverly intervened and informed the program director that a dispute over the property existed. The director required Gary to obtain Beverly's signature on a lease agreement by July 1, 1994. Beverly refused to sign until Gary agreed to deed her 280 acres in Campbell County, 1,200 acres of the Perkins County trust land and pay her $15,750 in cash rent (secured by a mortgage) in consideration for her leasing the 1,200 acres to Gary in 1994. Gary claims that he was unable to comply with Beverly's demands and, as a result, he lost ASCS benefits of approximately $30,000 and was unable to pay the 1993 taxes and other expenses associated with the ranch.

[¶ 8.] Beverly filed a complaint on November 1, 1994. She alleged that Gary "breached the covenant contained in the

---

2. Gary operated the family farm under a partnership arrangement with his father from 1960 until Rudolph died in 1974.

3. Farm # 1198 included property other than trust property in which Gary and Beverly had an undivided one-half interest. It also included a 160–acre "home quarter" and 240 acres,

all owned by Gary plus 80 acres owned by Carol Kolb and rented by Gary.

4. On June 14, 1994, Gary mortgaged part of the trust property in Perkins County to Clarke and Ruby Starr, who were later dismissed from this lawsuit.

Lease Agreement dated April 26, 1991, by his failure to pay the real estate taxes for 1993." She further alleged that the lease agreement terminated on May 31, 1993 and she was entitled to a portion of the proceeds from the crops and rents of 1994.

[¶ 9.] Gary claims that he held a valid, oral lease on the property until it was terminated in writing on July 27, 1994. As the 1994 lessee, he claims that he is solely entitled to all the 1994 proceeds, crops and payments from the leased land. He counterclaimed against Beverly for intentionally interfering and causing him to lose the 1994 ASCS benefits of approximately $30,000. He also sought punitive damages against Beverly.

[¶ 10.] On June 29, 1995, Beverly filed a motion for summary judgment arguing that Gary's oral lease terminated on Hannah's death, May 31, 1993. Gary argued that he held an oral lease for 1994 based on SDCL 43–32–22.1.[5] The trial court denied Beverly's motion.

[¶ 11.] On August 27, 1996, the trial court held an evidentiary hearing on Gary's claim for punitive damages against Beverly. After the hearing, Beverly again motioned for summary judgment arguing the identical issue of her June 29, 1995 motion. The trial court denied her motion a second time and determined that Gary would be permitted to submit his claim of punitive damages to the jury.

[¶ 12.] The jury trial was scheduled to commence on September 14, 1998. On July 31, 1998, Beverly filed a renewed motion for summary judgment arguing, for the third time, that Gary's oral lease of the trust land terminated when Hannah died in 1993. Despite the two prior denials, the trial court granted Beverly's motion on September 6, 1998 and the trial was canceled. Gary appeals summary judgment raising two issues, which are addressed in one.

## STANDARD OF REVIEW

[¶ 13.] Our standard of review for summary judgment is well established and briefly is "whether a genuine issue of material fact exists and whether the law was correctly applied." *Parmely v. Hildebrand,* 1999 SD 157, ¶ 7, 603 N.W.2d 713, 715–16 (citations omitted).

[¶ 14.] **WHETHER GENUINE ISSUES OF MATERIAL FACT EXIST THAT AN ORAL LEASE OF TRUST PROPERTY TERMINATED ON THE DEATH OF THE LIFE TENANT.**

■ [¶ 15.] Beverly argues that the trial court was correct in granting her motion for summary judgment because Gary only had an oral lease subject to Hannah's life estate.

■ [¶ 16.] As a general rule, a lease given by a life tenant is terminated upon the life tenant's death. *Strand v. Boll,* 44 S.D. 228, 183 N.W. 284, 285 (1921); 51 Am.Jur.2d *Life Tenants and Remaindermen* § 98 (1970). The rationale is that "a life tenant cannot make a lease which will extend beyond the life estate or confer greater rights upon h[er] lessee, as against the holders of future interests, than those which [s]he h[er]self possessed." *Drees Farming Ass'n v. Thompson,* 246 N.W.2d 883, 887–88 (N.D.1976) (citations omitted); 51 Am.Jur.2d *Life Tenants and Remain-*

---

**5.** In 1993, this statute provided:

In the case of farm tenants, occupying and cultivating agricultural land of forty acres or more, under an oral lease, the tenancy shall continue for the following crop year upon the same terms and conditions as the original lease unless written notice for termination is given by either party to the other by November first, whereupon the tenancy shall terminate March first following. The tenancy may not continue because of absence of notice if there is default in the performance of the existing rental agreement. For the purpose of this section, agricultural land includes grassland, either native or tame. In 1994, this statute was amended to change November first to September first. Act effective July 1, 1994, ch. 340, 1994 S.D. Laws 465.

*dermen* § 95 (1970). Thus, the lessee has no interest in the property once the life tenant dies. Therefore, under the general rule, the remainder of Gary's lease would be void upon Hannah's death.

[¶ 17.] Gary, however, argues that his oral leases in 1992 and 1993 were a continuation of the 1991 written lease agreement between himself and the co-trustees, Hannah and Beverly. He claims that Beverly, acting as co-trustee, consented to his lease of the trust property in 1992 and 1993.[6] Therefore, he claims that the oral lease continued until terminated by written notice of termination under SDCL 43–32–22.1.[7]

[¶ 18.] The Trust instrument specifically provides that "[u]pon the death of Hannah Larson, the Trust shall terminate and all of the assets, real and/or personal thereof, shall be paid over and distributed...." The instrument further provides "no beneficiary other than Hannah Larson shall have any power to sell, assign, tra[n]sfer, encumber or in any other manner to anticipate or dispose of his or her interest in the Trust ... prior to the actual distribution...."

■ [¶ 19.] In applying these explicit terms, it is clear that the Trust terminated immediately upon Hannah's death. Once the Trust terminates, the trustee's powers and duties are restricted to activities associated with winding up the trust. Restatement (Second) of Trusts § 344 (1959). In other words, Beverly's power, as co-trustee, to lease the land expired upon the death of Hannah:

> [I]n the absence of an enabling statute or provision in the trust instrument, [the trustee] does not have power to lease the [trust] property for a term extending beyond the life of the life beneficia-

ry, where such life ... marks the extent of the duration of the trust.

51 Am.Jur.2d *Life Tenants and Remaindermen* § 98 (1970). Furthermore, the terms of this trust instrument purport to prohibit Beverly, acting as a remainderman, from encumbering her interest in the property prior to distribution. Consequently, Beverly, acting either as co-trustee or remainderman, did not lease the property to Gary beyond the date of the life tenant's death under these circumstances.

[¶ 20.] The conduct of these parties also supports this conclusion. Gary claims he was leasing the property under a continuation of the 1991 written lease. However, when Hannah died, the parties began negotiations to partition the trust property. Beverly and Gary also discussed possible terms for a lease agreement of her interest, including a payment by Gary of cash rent. Given these facts, it is reasonable to conclude that the parties knew that the terms of the lease terminated upon Hannah's death.

■ [¶ 21.] Gary finally claims that the 1991 written lease continued in effect in 1994 because he was not provided with written notice of termination by November 1, 1993 as required by SDCL 43–32–22.1.

[¶ 22.] The Arkansas Supreme Court evaluated a similar issue in *Plafcan v. Griggs*, 291 Ark. 335, 724 S.W.2d 467, 468 (1987). In that case, Plafcan farmed a 70–acre tract of agricultural land "by oral agreement on a year-to-year basis from ... his mother, who had a life estate." After the mother's death in 1985, Griggs owned the land in fee simple absolute and ordered Plafcan to pay rent or vacate the premises, but Plafcan refused. Instead, he harvested the crop he had planted in 1984

---

**6.** Beverly asserts that Gary admitted that he never orally leased the Trust property from Beverly:

Q: You didn't have any oral leases like that with [Beverly], your sister, did you?

A: Well, she wouldn't sign anything anyway, so it doesn't matter.

Q: But you never had any oral leases from her, did you?

A: No.

**7.** For the full text of this statute, see *supra*, note 5.

and planted another crop. He claimed he was not required to vacate the land because he did not receive written notice prior to June 30, 1984, as required by Ark.Stat.Ann. § 50–531.[8] The Arkansas Supreme Court determined that the Arkansas Legislature:

> *did not intend to alter the legal interest which a tenant has in land;* the statute only establishes a date when an owner has to give notice to terminate a year to year farm lease. Unless the remainderman agrees to allow the tenant to remain, the tenant has no interest in the land.

*Id.* (emphasis added).

[¶ 23.] In aligning with the Arkansas Supreme Court's rationale, we determine that SDCL 43–32–22.1 does not alter the legal interest a lessee obtains from a life tenant lessor. We have already determined that Gary only held an oral lease of Hannah's life interest. Therefore, the lease terminated, by the terms of the Trust and by operation of law, on May 31, 1993, the date of death.[9] Written notice of termination under SDCL 43–32–22.1 was not required in this situation.

[¶ 24.] Because Gary's oral lease terminated on May 31, 1993 and written notice of termination did not have to be provided to him, Gary was not entitled to farm the trust property in 1994. Consequently, he was not entitled to the 1994 ASCS benefits for the trust property and his counterclaim against Beverly also fails as a matter of law.

[¶ 25.] However, when dealing with agricultural land, the lessee has the right to access the land in order to cultivate, protect and harvest crops planted prior to the death of the life tenant. *Strand,* 183 N.W. at 285 (stating "[t]his right is ordinarily referred to as the right or doctrine of 'emblements'...."). Therefore, even though the lease terminated on May 31, 1993, Gary was allowed to harvest the crops planted prior to Hannah's death, subject only to payment of rent to Beverly from that date.

[¶ 26.] Since there are no genuine material issues of fact and the law was correctly applied, summary judgment was proper and we affirm.

[¶ 27.] MILLER, Chief Justice, and AMUNDSON, KONENKAMP, and GILBERTSON, Justices, concur.

---

**8.** This statute provided:
> The owner of farm lands which are leased under an oral agreement may elect not to renew the oral rental or lease agreement for the following calendar year by giving written notice by certified registered mail to the renter or lessee, on or before June 30, that the lease or rental agreement will not be renewed for the following calendar year.

**9.** Even that part of the consideration for the lease, the obligation of Gary to pay "any expenses incurred by Hannah," ended upon her death.